# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| BRIAN SPELLS<br>30 Prospect Avenue<br>Vorhees, NJ 08043 | : <br> : <br> : <br> : | **CIVIL ACTION** |
| Plaintiff,<br>v. | : <br> : <br> : | No.: |
| PHYSICIAN AND TACTICAL<br>HEALTHCARE SERVICES, LLC *d/b/a*<br>PATHS, LLC<br>7895 Browning Road<br>Pennsauken, NJ 08109 | : <br> : <br> : <br> : <br> : <br> : | **JURY TRIAL DEMANDED** |
| Defendant. | : <br> : | |

## CIVIL ACTION COMPLAINT

Plaintiff, Brian Spells (*hereinafter* referred to as "Plaintiff"), by and through his undersigned counsel, hereby avers as follows:

## INTRODUCTION

1. Plaintiff has initiated this action to redress violations by Physician and Tactical Healthcare Services, LLC *d/b/a* PATHS, LLC (*hereinafter* "Defendant") of the Families First Coronavirus Response Act ("FFCRA" - Pub. L. No. 116-127, 134 Stat. 178 (2020)) and the Fair Labor Standards Act ("FLSA" - 29 U.S.C. § 201 *et. seq.*). As a direct consequence of Defendant's unlawful actions, Plaintiff seeks damages as set forth herein.

## JURISDICTION AND VENUE

2. This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims arise under the laws of the United States.

3. This Court may properly maintain personal jurisdiction over Defendant because its contacts with this state and this judicial district are sufficient for the exercise of jurisdiction in

order to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *Int'l Shoe Co. v. Washington,* 326 U.S. 310 (1945), and its progeny.

4. Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this district because Defendant is deemed to reside where it is subjected to personal jurisdiction, rendering Defendant a resident of the District of New Jersey.

## PARTIES

5. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

6. Plaintiff is an adult individual, with an address as set forth in the caption.

7. Physician and Tactical Healthcare Services, LLC *d/b/a* PATHS, LLC, a New Jersey corporation, provides a broad range of account receivable management, patient advocacy, and consultations services, with a location at the address set forth in the above-caption. Plaintiff was hired through and worked at this address.

8. At all times relevant herein, Defendant acted by and through its agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

## FACTUAL BACKGROUND

9. The foregoing paragraphs are incorporated herein as if set forth in full.

10. Plaintiff was employed with Defendant as a Medicare Billing Specialist for approximately 7 months, from on or about September 30, 2019 until his unlawful termination (discussed further *infra)* on or about May 1, 2020.

11. Plaintiff was a full-time employee with an hourly rate of $15.00.

12. Plaintiff was primarily supervised by Tina Smith-Watkins (*hereinafter* "Smith-Watkins") and generally supervised by Vice President of Customer Relations, Anna Martz (*hereinafter* "Martz").

13. Throughout his employment with Defendant, Plaintiff was a hard-working employee who performed his job well.

14. On or about March 19, 2020, as a result of the COVID-19 pandemic, Defendant sent an email to all employees which stated that: (1) beginning on Monday 23, 2020, some employees would be permitted to work remotely from home; (2) Defendant would be rotating employees who were permitted to work from home; and (3) employees who received work from home access would be determined by department management.

15. Defendant further informed Plaintiff and other employees that its server could "allow only so many employees to work from home." As a result, Defendant was informed that he was required to work in Defendant's facility.

16. Upon Plaintiff's information and belief, approximately 85% of Defendant's employees were permitted to work from home beginning on March 23, 2020 due to the COVID-19 pandemic, including all but 3 people in Plaintiff's department (including Plaintiff).

17. On or about April 1, 2020, while working at Defendant's facility, Plaintiff began to suffer from fever, chills and body aches. Plaintiff finished his shift but informed Human Resources ("HR") Representative, Jessica (last name unknown, *hereinafter* "Jessica") of his symptoms (some of which resembled COVID-19 symptoms) and asked about Defendant's pandemic protocol and what he should do next. Jessica responded that she would "get back to" Plaintiff.

18. After his work shift on or about April 1, 2020, Plaintiff attended a remote appointment with an urgent care physician, who recommended that Plaintiff self-quarantine for

the next 14 days due to COVID-19 concerns, and if Plaintiff did not feel better within that time period, he should undergo COVID-19 testing.

19. Following his remote urgent care doctor's appointment (*see* Paragraph 18, *supra*), Plaintiff immediately emailed both Smith-Watkins and Jessica, provided them with urgent care documentation that he needed to remain self-quarantined out of work for 14 days due to COVID-19 concerns, and requested sick leave. Jessica responded via text message, that she was "in receipt of [Plaintiff's] documentation and w[ould] review and call [him] at some point tomorrow with an update."

20. On or about April 3, 2020, Jessica reached out to Plaintiff via phone and advised him of his "options" for sick leave, which included paid sick leave "under the new federal law" or filing for unemployment benefits. Plaintiff requested the paid sick leave option.

21. On or about April 4, 2020, Jessica reached back out to Plaintiff via phone, informed him that Defendant refused to give him the paid sick leave (without further explanation), and advised him that filing for unemployment benefits would be "better than taking sick leave." Plaintiff thereafter filed for unemployment benefits.

22. Throughout his doctor-imposed self-quarantine, Plaintiff regularly kept in touch with Jessica regarding the status of his symptoms and anticipated return to work date.

23. For example, on or about April 9, 2020, Plaintiff texted Jessica that he had been seen by his primary physician and provided her with a note stating that he could return to work on or about April 16, 2020, following his two-week quarantine period.

24. On or about April 11, 2020, Plaintiff contacted Jessica and informed her that he was developing a cough (a primary COVID-19 symptom) and would be undergoing COVID-19 testing on or about April 16, 2020. Jessica responded that Plaintiff should "let [her] know what happens," and she would "advise management" of his status.

25. On or about April 18, 2020, Plaintiff contacted Jessica and provided her with a note stating that he had tested negative for COVID-19. Jessica replied via text to Plaintiff "that is good news," but that Plaintiff was "expected to return to work on Thursday 4/23," and "keep [her] posted if anything changes."

26. On or about April 22, 2020, Plaintiff texted Jessica that his primary physician recommended that he continue to self-quarantine and advised Plaintiff to ask his employer if "there were any work from home options."

27. In response to Plaintiff's aforesaid text requesting the ability to work remotely (*see* Paragraph 26, *supra*), Jessica informed Plaintiff that his "position does not allow the work from home option," and his "choice at this point would be to return tomorrow at [his] full time in office status or take a voluntary layoff due to [his] COVID concerns."

28. Plaintiff replied to Jessica's aforesaid text denying him the ability to work remotely because of his COVID-19 concerns (*see* Paragraph 27, *supra*), reminding her that employees had been informed there would be a rotation of who would be permitted to work from home (which never occurred), and that he performed primarily the same online work as his fellow co-workers that were permitted to work remotely. Jessica replied only that Plaintiff "would need to discuss that with [Martz]."

29. On or about April 24, 2020, Jessica texted Plaintiff that Defendant was "unable to provide [Plaintiff] with home access," would "need to lay [him] off, and Plaintiff "could reach back out" and apply for a position with Defendant once his COVID-19 concerns were resolved. Plaintiff responded by asking Jessica about the reapplication process once he was cleared to work in the office, but she never replied to his text.

30. On or about April 27, 2020, Plaintiff again contacted Jessica by text, informed her that he was medically cleared by his doctor to return to work in the office as of May 1, 2020,

asked if he could direct all potential references checks to her if Defendant had no work for him or to let him know a date that he could start again if there was a job open.

33. Plaintiff's doctor's office sent Jessica a note that same day (April 27, 2020), clearing Plaintiff to return to work in the office on or about May 1, 2020; however, Plaintiff has not received a response to his text or doctor's note from Jessica or any other member of Defendant's management.  As a result, Plaintiff believes that he was terminated from his employment and not rehired with Defendant following his May 1, 2020 medical clearance as a result of his requests for paid sick leave under the FFCRA/FLSA.

32. Plaintiff believes and therefore avers that Defendant (1) willfully denied Plaintiff's request for qualifying paid sick leave under the FFCRA from in or about April 2, 2020 until on or about April 16, 2020; (2) failed to compensate Plaintiff his regular wages for same; (3) refused to allow him to work from home following his qualifying paid sick leave (while the majority of his co-workers were permitted to telework); (4) terminated him in retaliation for his request for emergency paid sick leave and his COVID-19 concerns in violation of the FFCRA/FLSA; and (5) refused to rehire him following his medical clearance to physically return to work (rather than telework).

## COUNT I
## Violations of the Families First Coronavirus Response Act ("FFCRA") & the Fair Labor Standards Act ("FLSA")
### ([1] Wrongful Termination; [2] Unpaid Wages; and [3] Retaliation)

33. The foregoing paragraphs are incorporated herein as if set forth in full.

34. Effective April 1, 2020, the FFCRA provides for up to 80 hours of paid sick time to eligible full-time employees who are unable to work or telework due to the effects of COVID-19 through the Emergency Paid Sick Leave Act.  *See* FFCRA, at §§ 5102(a) and (b)(A).

35. The FFCRA has expressly identified that enforcement of and all penalties arising from violations of the Emergency Paid Sick Leave Act shall be governed by relevant sections of the FLSA, as set forth in more detail below.

36. Defendant is engaged in an industry affecting commerce and employees, is a private entity, and employs fewer than 500 employees. *Id.* at § 5110(2)(B)(aa).

37. Plaintiff was an eligible employee as defined by Section 3(e) of the FLSA (29 U.S.C. § 203(e)), who had "been advised by a health care provider to self-quarantine due to concerns related to COVID-19" and/or was "experiencing symptoms of COVID-19 and seeking a medical diagnosis" under the FFCRA, § 5102(a)(2) and (3).

38. Defendant knew that Plaintiff was an eligible employee within the meaning of the FLSA and the FFCRA.

39. Plaintiff requested paid sick leave for the two-week period (from in or about April 2, 2020 to on or about April 16, 2020) that he was advised to self-quarantine by his physician due to COVID-19 concerns.

40. Defendant was required to pay Plaintiff's "regular rate of pay up to $511 per day, and $5,110.00 in the aggregate" for the two-week emergency paid sick leave period due to COVID-19 concerns. *See Id.* at § 5110(5)(A)(ii)(I).

41. Defendant denied Plaintiff leave under the Emergency Paid Sick Leave Act of the FFCRA and failed to compensate him for his regular rate of pay for the required 80-hour sick leave period.

42. An employer who fails to pay an employee his regular rate of pay under the FFCRA is "considered to have failed to pay minimum wages in violation of section 6 of the FLSA (29 U.S.C. § 206)." *Id.* at § 5105(a)(1).

43. It is also unlawful for any employer to discharge, discipline, or in any other manner discriminate against any employee" who exercises his rights to "take leave in accordance with this Act." *Id.* at § 5104. "An employer who willfully violates section 5104 shall . . . be considered to be in violation of section 15(a)(3) of the Fair Labor Standards Act of 1938 (29 U.S.C. § 215(a)(3))." *Id.* at § 5105(b)(1).

44. Additionally, an employer who in any way disciplines, discriminates or retaliates against, and/or discharges an employee in violation of this Act is subject to the penalties described in sections 16 and 17 of the FLSA (29 U.S.C. § 216, 217) with respect to such violation. *Id.* at § 5105(b)(2). Penalties under sections 16 and 17 of the FLSA include, but are not limited to, lost wages, an equivalent amount of liquidated damages, and attorney's fees and costs. *See* FLSA*,* 29 U.S.C. § 216; 217.

45. Defendant willfully (1) denied Plaintiff's request for qualifying paid sick leave under the FFCRA from in or about April 2, 2020 until on or about April 16, 2020; (2) failed to compensate Plaintiff his regular wages for same; (3) refused to allow him to work from home following his qualifying paid sick leave (while the majority of his co-workers were permitted to telework); (4) terminated in retaliation for his request for emergency paid sick leave and his COVID-19 concerns in violation of the FFCRA and the FLSA; and (5) refused to rehire him following his medical release to physically return to work (rather than teleworking).

46. These actions as aforesaid constitute violations of the FFCRA and the FLSA.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendant is to compensate Plaintiff, reimburse Plaintiff and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to past lost earnings and any other owed compensation.

Plaintiff should be accorded those benefits illegally withheld from the date he first suffered legal violations at the hands of Defendant until the date of verdict;

B. Plaintiff is to be awarded liquidated damages, as permitted by applicable law, in an amount determined by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future (and to compensate Plaintiff for lost use of income);

C. Plaintiff is to be accorded any and all other equitable and legal relief as the Court deems just, proper and appropriate;

D. Plaintiff is to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable federal and state law;

E. Any verdict in favor of Plaintiff is to be molded by the Court to maximize the financial recovery available to the Plaintiff in light of the caps on certain damages set forth in applicable federal law; and

F. Plaintiff's claims are to receive trial by jury to the extent allowed by applicable law. Plaintiff has also endorsed this demand on the caption of this Complaint in accordance with Federal Rule of Civil Procedure 38(b).

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By: _____
Ari R. Karpf, Esq.
3331 Street Road
Two Greenwood Square
Suite 128
Bensalem, PA 19020
(215) 639-0801

Dated: May 21, 2020