**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

BRIAN SPELLS,                        1:20-cv-6213-NLH-EAP

          Plaintiff,          **OPINION**

     v.

PHYSICIAN AND TACTICAL
HEALTHCARE SERVICES, LLC,
*d.b.a.* PATHS, LLC.,

          Defendant.

---

**HILLMAN**, District Judge

    This matter comes before the Court by way of a motion for
summary judgment, [Docket Number 19], filed by Defendant,
Physician and Tactical Healthcare Services, LLC, *doing business
as* PATHS, LLC ("PATHS"), pursuant to Federal Rule of Civil
Procedure 56.  Also before the Court is Plaintiff Brian Spells'
cross-motion for summary judgment on the claim that Defendant
failed to pay his paid sick leave under the FFCRA and retaliated
against him [Dkt. No. 25].

    The Court has considered the parties' submissions and
decides this matter without oral argument pursuant to Rule 78 of
the Federal Rules of Civil Procedure and Local Civil Rule 78.1.
For the reasons set forth below, the Court will grant
Defendant's motion for summary judgment and deny Plaintiff's

cross-motion for summary judgment.

I.   **FACTUAL AND PROCEDURAL HISTORY**

This labor and employment action concerns alleged violations of the Families First Coronavirus Response Act (the "FFCRA" and the "Act"), Pub. L. No. 116-127, 134 Stat. 178, (Mar. 18, 2020), and the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. § 201 *et seq*. The Court takes its facts from the record and the parties' statements of material facts not in dispute. The Court will note disputes where relevant.

A.   **Background**

PATHS is a billing services company that contracts with medical and healthcare providers, such as hospitals, to provide accounts receivable management services. Defendant's Statement of Undisputed Facts ("D.'s Facts") [Dkt. No. 19-1], at ¶1. Anna Martz ("Martz") is PATHS' Vice President of Client Services; thus, her duties include overseeing the hospital receivables and healthcare billing departments. Id. at ¶¶2-3. Each of the departments[1] under Martz's supervision includes a supervisor who oversees the staff (namely billing representatives), and two departments have managers who in turn oversee the supervisors.

---

[1] Specifically, Martz oversees the Medicare, HMO, Medicaid, and hospital legacy projects departments. Plaintiff's Response to Defendant's Statement of Undisputed Facts ("P.'s Opp. Facts") [Dkt. No. 24-1], at ¶5; D.'s Facts at ¶7.

Id. at ¶¶5-8.  Martz's departments include approximately ninety
billing representatives, of which thirteen work in the Medicare
Department.  Id. at ¶9.

Plaintiff joined PATHS as a Billing Representative in
PATHS's Medicare department on September 30, 2019.  Id. at ¶¶39-
42.  He was paid as an hourly employee.  Complaint [Dkt. No. 1],
at ¶11.  Tina Smith-Watkins ("Smith-Watkins") supervised
Plaintiff's department and was his immediate supervisor.  D.'s
Facts at ¶43.  Martz was Plaintiff's next level up supervisor.
Id. at ¶44.

**B.   PATHS' Leave Request Process and Response to COVID-19**

PATHS' Human Resources Department handles employees' leave
requests.  Id. at ¶¶10-12.  To request leave, employees must
electronically submit a request in writing via email or another
internal system or directly call the Human Resources Department.
Ibid.; P.'s Opp. Facts at ¶12.  All leave requests are processed
and overseen by Jessica Rossano ("Rossano"), PATHS' Director of
Human Resources, who has the ability to grant and deny requests
and is available to answer employees' leave questions.  D.'s
Facts at ¶¶13-14.  Rossano was also responsible for developing
and administering all employee leave policies.  Declaration of
Jessica Rossano ("Rossano Decl.") [Dkt. No. 19-4], at ¶3.

On or about March 18, 2020, Rossano learned the FFCRA had
been signed into law and that it contained paid leave

3

entitlements for businesses' employees.  Id. at ¶22.  Passage of
the FFCRA prompted Rossano to research whether its paid leave
entitlements applied to Defendant's employees.  Id. at ¶¶22-24;
Rossano Decl. at ¶¶4-7.  Ultimately, Rossano, in discussion with
PATHS' CEO Tony Mackiewicz ("Mackiewicz"), determined, based on
available information regarding the FFCRA, that Defendant's
employees were not exempt from the FFCRA's paid leave
requirements for employees.  D.'s Facts at ¶27.

On March 19, 2020, Defendant's Human Resources Department
circulated an email to all employees addressing the COVID-19
pandemic's impact on the business's operations and plans to move
forward.  Id. at ¶¶18-21.  Specifically, Defendant's plan was to
allow certain employees to work remotely starting March 20,
2020, while other employees would be rotated from working from
home and in person – leaving the decision as to which employees
could receive work from home access to each department's
management.  Id. at ¶21; Complaint at ¶14; Exhibit E to
Defendant's Motion [Dkt. No. 25-13].

Martz was in charge of deciding which employees in the
Medicare Department could work from home.  Id. at ¶47.  Martz
testified that it was never the goal to allow every employee to
work remotely.  Rather, remote work was prioritized based on
employees who met the CDC's requirements, such as pregnant
women, people with preexisting conditions warranting remote

4

work, those with childcare issues, and those age 60 and older.
Id. at ¶¶48-49.  Martz testified that she and Smith-Watkins
decided not to allow four billing representatives from the
Medicare Department, including Plaintiff, to work remotely,
since Plaintiff and two of these individuals lacked "enough
experience and needed management and additional assistance,[2]
while the fourth individual had "issues."  Id. at ¶50-51.  In
fact, no Medicare Department employee with less than two years
of experience was allowed to work remotely.  Id. at ¶52.  Martz
testified that the decision of which employees from the Medicare
Department could work from home was made on or about March 19,
2020.  Id. at ¶53.

On March 26, 2020, Rossano circulated another email to
Defendant's employees, attaching a circular from the Department
of Labor ("DOL") entitled Employee Rights Paid Sick Leave and
Expanded Family and Medical Leave Under the Families First
Coronavirus Response Act.  D.'s Facts at ¶28.

**C.   Plaintiff Falls Ill and Takes Leave, and PATHS' Response**

---

[2] Plaintiff disputes that he needed oversight and further
management, claiming he could have worked remotely as his work
utilized a computer and phone and any supervision he received
from Smith-Watkins during the COVID pandemic was from her remote
location.  Martz testified that she and Smith-Watkins did not
work remotely all the time.  Rather, Smith-Watkins worked from
home two days a week and Martz was primarily in the office each
day.  This is not a material dispute of fact.

On the morning of March 31, 2020, Plaintiff emailed Human Resources inquiring about his "options right now."  Exhibit I [Dkt. No. 19-17].  Plaintiff's email expressed concern about the fact he comes into the office daily despite the growing number of COVID-19 cases in New Jersey, and he asked whether he had the option to quarantine, especially if a doctor were to recommend it.  Id.  The email further requests whether he could be allowed to work from home a few days out of the week.  Id.  There was no mention of a request to take paid sick leave.

Upon receipt of Plaintiff's email, Rossano contacted Martz that same day, inquiring whether Plaintiff could work remotely.  D.'s Facts at ¶57.  Martz said no, as she felt Plaintiff needed more training and needed direct supervision.  Ibid.  Plaintiff and Mertz then spoke, to which he said he was starting to experience possible COVID-19 symptoms, ergo the reason his email asked about quarantining.  P.'s Opp. Facts at ¶58.  Mertz then relayed this information to Rossano, who sent Plaintiff a reply email recommending that he contact his "healthcare provider for guidance" and if quarantine was recommended, then he should provide supporting documentation to Human Resources directly and advise his management team.  D.'s Facts at ¶59.  Rossano also provided Plaintiff with her cellphone number so he could contact her with any further questions or concerns.  The two exchanged messages over the subsequent weeks.  Ibid.

After speaking with his primary care physician about his "body ache" and "chills," Plaintiff met with a doctor through a virtual appointment.  Id. at ¶¶62-64.  The doctor recommended that Plaintiff quarantine due to the possibility that his symptoms could be the COVID-19 virus and provided him with a doctor's note attesting to the same.  P.'s Opp. Facts at ¶65.  That same day, March 31, 2020, at 4:44 pm, Plaintiff texted Rossano a copy of the Doctor's note, which states he "**can stop home isolation when: [he] ha[s] no fever for 72 hours AND [his] symptoms have significantly improved AND at least 7 days have passed since the onset of [his] symptoms.**"  Exhibit F to Plaintiff's Opposition to Defendant's Motion and in support of Plaintiff's Cross-Motion [Dkt. No. 24-3], at 255 (emphasis in original).  Rossano confirmed receipt of the documentation and advised Plaintiff she would call him "at some point tomorrow with an update."  D.'s Facts at ¶67.  March 31, 2020 was the last day Plaintiff was physically present at Defendant's office.  Id. at ¶104.

**D.    The DOL Issued New Guidance Regarding the FFCRA, Changing PATHS' Response to COVID-19**

Rossano claims that on or about April 2, 2020, she "learned that the DOL issued new regulations and guidance regarding the 'health care provider' exemption to the FFCRA, which [she] understood to include employees who worked for companies who

contracted or provided services to health care providers." D.'s Facts at ¶30. Specifically, Rossano claims she visited the FFCRA section of the DOL's website where it addressed "Frequently Asked Questions." Rossano Decl. at ¶¶13-14. Rossano claims she relied on the DOL's guidance / the "Frequently Asked Questions" section of the DOL's FFCRA website, and, after a conversation with Mackiewicz, they both decided that the guidance now meant that Defendant's employees were exempt from the FFCRA's paid leave protections because PATHS contracts with health care providers such as hospitals to support those health care entities' continued operations. Id. at ¶15.

That same day, and following up on their conversation, Rossaro sent Mackiewicz an email with language she says she copied and pasted from the DOL's FFCRA website regarding "Frequently Asked Questions." Id. at ¶16. Her email reads, in relevant parts:

> Per our conversation earlier, I wanted to provide additional information regarding the healthcare provider exemption from entitlement to the FFCRA.
>
> The new []DOL guidance broadens the "health care provider" exemption from entitlement to emergency paid leave to include nearly any employee who is employed by a medical provider or an entity that *contracts* with a medical provider or that merely provides supplies to medical providers. Number 56 of the []DOL's Questions and Answers web page

("Q&A");
http://www.dol.gov/agencies/whd/pandemic/ffc
ra-questions

*Who is a "health care provider" who may be
excluded by their employer from paid sick
leave and/or expanded family and medical
leave?*

*For purposes of Employees who may be
exempted from Paid Sick Leave or Expanded
Family and Medical Leave by their Employer
under the FFCRA, a health care provider is
anyone employed at a doctor's office,
hospital, health care center, clinic, post-
secondary educational institution offering
health care instruction, medical school,
local health department or agency, nursing
facility, retirement facility, nursing home,
home health care provider, any facility that
performs laboratory or medical testing,
pharmacy, or any similar institution,
Employer, or entity.  This includes any
permanent or temporary institution,
facility, location, or site where medical
services are provided that are similar to
such institutions.*

*This definition includes any individual
employed by an entity that contracts with
any of these institutions described above to
provide services or to maintain the
operation of the facility where that
individual's services support the operation
of the facility.  This also includes anyone
employed by any entity that provides medical
services, produces medical products, or is
otherwise involved in the making of COVID-19
related medical equipment, tests, drugs,
vaccines, diagnostic vehicles, or
treatments.  This also includes any
individual that the highest official of a
State or territory, including the District
of Columbia, determines is a health care
provider necessary for that State's or
territory's or the District of Columbia's
response to COVID-19.*

> *To minimize the spread of the virus*
> *associated with COVID-19, the Department*
> *encourages employers to be judicious when*
> *using this definition to exempt health care*
> *providers from the provisions of the FFCRA.*

Exhibit A-3 [Dkt. No. 19-7] (emphasis in original).  Upon review of the email, Mackiewicz responded that Rossano was to inform the management team that PATHS employees were exempt from the FFCRA paid leave protections.  D.'s Facts at ¶35.

On the morning of April 3, 2020, Rossano emailed the heads of Defendant's departments to advise that the DOL's new guidance provided that "PATHS employees are exempt from entitlement to the FFCRA."  Id. at ¶36.  Accordingly, Defendant claims it relied in good faith on the DOL's guidance to determine its employees fell under the health care provider exemption to the FFCRA, as Rossano declares that "PATHS would not have made this decision absent reliance on the DOL or regulations and guidance that were made available in April 2020."  Id. at ¶¶37-38.

**E.   PATHS' Response to Plaintiff After the DOL's Guidance**

On April 3, 2020, Rossano and Plaintiff spoke by phone. Id. at ¶69.  Defendant avers that Plaintiff was uncertain about what they discussed but asserts that Rossano presented the options of Plaintiff either using his paid time off/sick leave that he had accumulated or to apply for unemployment benefits. Id. at ¶¶70-71.  Plaintiff counters that he requested paid leave

under the FFCRA / "under the new federal law" but he was advised
by Rossano that he should instead apply for unemployment
benefits since he was not eligible under the FFCRA's new
regulations and guidance.  P.'s Opp. Facts at ¶¶70-73.
Plaintiff denies that Rossano ever told him that he could use
his sick leave/paid time off benefits.  Ibid.  Defendant claims
Plaintiff did not indicate to Rossano which of the two options
he wanted to pursue, D.'s Facts at ¶74, while Plaintiff claims
Rossano advised he was not eligible for paid leave under the
FFCRA and that he should apply for unemployment benefits – which
he ultimately did.  P.'s Opp. Facts at ¶74.  Plaintiff and
Rossano ended the call with him noting he had a follow up
doctor's appointment, and he would keep her apprised of any
developments.  Id. at ¶75.  Rossano then advised Martz that
Plaintiff was on a leave of absence to quarantine and they would
confirm his return to work date.  D.'s Facts at ¶76.

On April 9, 2020, Plaintiff texted Rossano a note from his
doctor that explained he could return to work on April 16, 2020.
Id. at ¶78.  Rossano texted back she would "advise [his]
management staff accordingly and we will see you [Thursday]."
Exhibit F to Plaintiff's Opposition to Defendant's Motion and in
support of Plaintiff's Cross-Motion [Dkt. No. 24-3], at 261-263.
On April 15, 2020, Plaintiff texted Rossano that his doctor
recommended he get tested for COVID-19 and that he was going to

an appointment that day.  D.'s Facts at ¶81.  Rossano responded
she would advise management accordingly and asked that he please
let her know the test results.  Ibid.  On Monday, April 20,
2020, Plaintiff texted Rossano another doctor's note stating his
test results were negative for COVID-19.  Id. at ¶82.  Based on
the note and their messages, Rossano informed Plaintiff that he
was expected to return to work on Thursday, April 23, 2020, to
which he agreed.  Id. at ¶¶82-86.

On April 22, 2020, Plaintiff emailed his doctor saying he
was afraid to work at the office and thus requested that she
prepare a note stating he needed to work remotely or not at all
because he was at high risk for COVID-19.  Id. at ¶87.  That
same day, Plaintiff texted Rossano that his doctor did not
recommend he return to work because he was just getting over his
symptoms and that the doctor asked whether Plaintiff could be
allowed to work from home.  Id. at ¶88.  Rossano responded that
his position did not allow him the option to work from home and
his "choice at this point would be to return tomorrow at [his]
full time in office status or take a voluntary lay off due to
[his] COVID concerns."  Id. at ¶89.

Rossano further advised that "unfortunately who and which
positions received home access was/is determined by department
management and not HR," thus he needed to discuss his remote
work request with Martz.  Id. at ¶90.  Later that afternoon,

Plaintiff texted Rossano an undated note from his doctor, which
stated, "[p]lease allow Brian Spells to work from home due to
illness until June 1, 2020." Id. at ¶91. Rossano discussed the
situation with Martz, who determined that "[d]ue to the length
of leave at this time and that the demands on the department and
unprecedented times for everybody," Plaintiff's "position could
not be held for that time frame." Id. at ¶93. Thus, Martz and
Rossano decided Plaintiff would have to be voluntarily laid off
if he did not decide to return to in person work. Id. at ¶94.

On April 24, 2020, Rossano texted Plaintiff,
"[u]nfortunately, we are unable to provide you with home access,
therefore, we will need to lay you off. You may reach back out
to management for reemployment opportunities once you are
cleared to work in an office environment. Best of luck and stay
safe." Id. at ¶¶96-97. Plaintiff responded, asking whether he
would be cleared to come back or if he had to reapply for a job,
but Rossano did not reply. Exhibit F to Plaintiff's Opposition
to Defendant's Motion and in support of Plaintiff's Cross-Motion
[Dkt. No. 24-3], at 272-73.

On April 27, 2020, Plaintiff sent another text message to
Rossano, noting he felt better from his COVID-19 concerns and
was cleared to return to work on May 1, 2020. Id. at 273. His
text message further inquired whether there was a job open for
him and whether he could direct references to Rossano if PATHS

13

did not have open positions.  Ibid.  Rossano testified that she did not respond to Plaintiff's messages as she had already made clear the need for him to contact management as to whether he could reapply to PATHS, D.'s Facts at ¶100, but claims she relayed the messages to Martz, who claimed not to recall this. Plaintiff's Counter Statement of Material Facts [Dkt. No. 24-2], at ¶¶63-64; Defendant's Response to Plaintiff's Statement of Material Facts [Dkt. No. 27-1], at ¶¶63-64.  Plaintiff never contacted his prior managers (Smith-Watkins and Martz) regarding whether he could return to work at PATHS.  Id. at ¶101.

On May 13, 2020, Defendant issued a letter to Plaintiff, notifying him of the voluntary termination of his employment effective April 24, 2020 and that he would be paid out all of his accrued paid time off and sick leave.  Id. at ¶¶102-103. Defendant has not hired any billing representatives to Plaintiff's department since he was laid off.  Id. at ¶106; Defendant's Response to Plaintiff's Statement of Material Facts [Dkt. No. 27-1], at ¶69.  In fact, Martz testified that she never considered contacting Plaintiff for reemployment because there was not enough work in that department, which saw its business drop "tremendously" as a result of COVID and still is not back up to where it was pre-COVID.  Id. at ¶107.

**E.   PATHS Revises Its Leave Policy Following Updated Guidance Issued by the DOL**

Rossano declares that in or around September 2020, she learned the DOL would issue new regulations and guidance regarding the FFCRA.  Id. at ¶109.  Rossano further declares that PATHS was not aware that a court had invalidated the prior regulations and guidance that took effect in April 2020.  Id. at ¶110.  At some time between September 11, 2020 and October 6, 2020, Rossano learned that the DOL issued new regulations and guidance limiting the health care provider exception to the FFCRA such that the "exemption no longer covered employees of companies who contracted with health care providers."  Id. at ¶111.  Rossano and Mackiewicz then determined that PATHS' employees were no longer covered by the health care provider exemption to the FFCRA.  Rossano Decl. at ¶25.  Accordingly, on October 6, 2020, Rossano circulated an email to all PATHS employees from PATHS' general Human Resources email account, as well as cc'ing Mackiewicz, to advise of the revised DOL regulations and guidance, which she notes became effective on September 16, 2020, and she also provided a hyperlink to the guidance.  D.'s Facts at ¶112.

Rossano further declares that after PATHS adopted the DOL's revised guidance, thirty employees requested and received paid sick leave under the FFCRA's Emergency Paid Sick Leave Act ("EPSLA") and Emergency Family and Medical Leave Expansion Act ("EFMLEA").  Id. at ¶113.  Among these thirty employees were

several billing representatives, including a billing representative from Plaintiff's former Medicare department.  Id. at ¶114.  In fact, according to Rossano, after PATHS adjusted to the DOL's September regulations and guidance, "[e]very single employee who requested and received FFCRA leave returned to work at PATHS following their leave without issue."  Id. at ¶115.

**F.   Factual Summary and Litigation History**

In sum, Plaintiff avers he was entitled to paid sick leave because he had symptoms that presented as possibly related to COVID-19, he sought medical care concerning those symptoms, and was told by his doctor to quarantine as there was a risk he had COVID-19.  Plaintiff claims Defendant did not provide him with paid sick leave as it was required to under the FFCRA, instead telling him he had to either use his accrued sick and vacation paid time off or take a voluntary layoff – the later he equates to being wrongfully terminated or discharged under the FFCRA. As Defendant did not hire Plaintiff back and failed to accommodate his request to work remotely (as had been afforded to other employees), he also argues he was discriminated against for taking sick leave while quarantining for concerns regarding COVID-19.

In contrast, Defendant argues Plaintiff was not entitled to paid sick leave under the FFCRA as the DOL's regulations and guidance exempted PATHS' employees from the paid sick leave

16

entitlement during the time period of Plaintiff's employment and voluntary layoff.  While the regulations and guidance changed, Defendant argues it reasonably relied on the information to set its policy as is evidenced by the fact Defendant changed its paid sick leave policy each time it learned of the and enactment and updates to the FFCRA.  Defendant also argues that it did not discriminate against Plaintiff.

It is against this record that on May 21, 2020, Plaintiff filed the instant action against Defendant, asserting a claim for wrongful termination, unpaid wages, and retaliation under the FFCRA through the FLSA.  On August 3, 2020, Defendant filed its Answer and Affirmative Defenses to the Complaint, asserting, among other things, that: (1) "Defendant's actions were taken in good faith in accordance with the laws, regulations, guidance, interpretation, and/or practice of the Department of Labor in effect at the time the actions were taken," (2) "Plaintiff was not eligible for leave under the applicable statutes and regulations, including those cited in the Complaint," and (3) "Plaintiff was exempt from leave under the applicable statutes and regulations, including those cited in the Complaint." Answer [Dkt. No. 7], at 9, ¶¶11-13.  On April 15, 2021, Defendant filed the instant motion for summary judgment.[3]

---

[3] Defendant's brief is overlength by one page, see L. Civ. R. 7.2(b) and (d), a fact that Defendant acknowledges after the

Plaintiff filed their opposition and cross-motion for summary judgment on May 24, 2021, and Defendant filed its reply on June 14, 2021.  Thus, the motions for summary judgment are ripe for adjudication.

## II.   DISCUSSION

### A.   Jurisdiction

The Court has original subject matter jurisdiction over this matter because it arises under the laws of the United States and raises a federal question.  28 U.S.C. § 1331.

### B.   Motion For Summary Judgment Standard

Summary judgment is appropriate where the Court is satisfied that "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any,' ... demonstrate the absence of a genuine issue of material fact" and that the moving party is entitled to a judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving

---

fact in its April 15, 2021 Letter to the Court requesting permission after the fact.  Letter [Dkt. No. 20].  Defendant requests the Court grant it permission to file an overlength brief *nunc pro tunc*.  Local Civil Rule 7.2(b) notes that "[b]riefs of greater length will only be accepted if special permission of the Judge or Magistrate Judge is obtained prior to submission of the brief.  That application will be granted.

party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248 (1986).  A fact is "material" if, under the governing

substantive law, a dispute about the fact might affect the

outcome of the suit.  Id.  "In considering a motion for summary

judgment, a district court may not make credibility

determinations or engage in any weighing of the evidence;

instead, the non-moving party's evidence 'is to be believed and

all justifiable inferences are to be drawn in his favor.'"

Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)

(citing Anderson, 477 U.S. at 255).

Initially, the moving party bears the burden of

demonstrating the absence of a genuine issue of material fact.

Celotex, 477 U.S. at 323 ("[A] party seeking summary judgment

always bears the initial responsibility of informing the

district court of the basis for its motion, and identifying

those portions of 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the

affidavits, if any,' which it believes demonstrate the absence

of a genuine issue of material fact."); see Singletary v. Pa.

Dep't of Corr., 266 F.3d 186, 192 n.2 (3d Cir. 2001) ("Although

the initial burden is on the summary judgment movant to show the

absence of a genuine issue of material fact, 'the burden on the

moving party may be discharged by "showing"—that is, pointing

out to the district court—that there is an absence of evidence

19

to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof." (citing <u>Celotex</u>, 477 U.S. at 325)).

Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  <u>Celotex</u>, 477 U.S. at 324.  A "party opposing summary judgment 'may not rest upon the mere allegations or denials of the . . . pleading[s].'" <u>Saldana v. Kmart Corp.</u>, 260 F.3d 228, 232 (3d Cir. 2001).  For "the non-moving party[] to prevail, [that party] must 'make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  <u>Cooper v. Sniezek</u>, 418 F. App'x 56, 58 (3d Cir. 2011) (citing <u>Celotex</u>, 477 U.S. at 322). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  <u>Anderson</u>, 477 U.S. at 257.

C.   **Applicable Law and Analysis**

As Plaintiff's sole claim concerns violations of the FFCRA's EPSLA, which in turn triggers the FLSA, the Court's analysis centers on the FFCRA and its interplay with other statutes.

On March 18, 2020, Congress enacted the FFCRA in response

to the issues facing employees and the general public as a
result of the COVID-19 pandemic.  Ponti v. Shrewsbury School
Dist. Bd. of Educ., No. 21-3415 (FLW), 2021 WL 7904058, at *3
(D.N.J. Dec. 1, 2021) (citation omitted).  "Broadly speaking ...
the FFRCA obligates employers to offer sick leave and emergency
family leave to employees who are unable to work because of the
pandemic."  New York v. U.S. Dep't of Labor, 477 F. Supp. 3d 1,
5 (S.D.N.Y. 2020).[4]  Thus, the FFCRA was passed to alleviate
pandemic-related problems.

Among its many provisions, the FFCRA includes the EPSLA,[5]
which, as its name suggests, requires employers to provide paid
sick leave (up to 80 hours of job-protected paid sick leave to
full-time employees), FFCRA §§ 5102(b)(2)(A), 5104(1), to
employees with any one of six qualifying COVID-19-related
conditions.  The six conditions concern any employee that:

1.   "is subject to a Federal, State, or local quarantine
     or isolation order related to COVID-19";
2.   "has been advised by a health care provider to self-
     quarantine due to concerns related to COVID-19";
3.   "is experiencing symptoms of COVID-19 and seeking a
     medical diagnosis";
4.   "is caring for an individual subject" to a

_____

[4] As the case law concerning the FFCRA is still largely in its
infancy and has been considered by courts across the country,
this Court in turn will generally look to rulings outside of
this district and circuit where appropriate for guidance as to
how courts have ruled on similar cases.

[5] The EPSLA took effect on April 2, 2020, and it expired on
December 31, 2020.  See FFCRA §§ 5108-5109.

> > quarantine or isolation order by the government or a healthcare provider;
> >
> > 5.    is caring for a child whose school or place of care is closed, or whose childcare provider is unavailable, because of COVID-19; or
> >
> > 6.    "is experiencing any other substantially similar condition specified by the Secretary of Health and Human Services in consultation with the Secretary of the Treasury and the Secretary of Labor."

New York, 477 F. Supp. 3d at 5-6 (quoting FFCRA § 5102(a)). Pursuant to Section 5104 of the FFCRA's EPSLA, employers are prohibited from "discharge[ing], discipline[ing], or in any manner discriminat[ing] against any employee who ... takes leave in accordance with the Act[]," and who "has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act." Id. § 5104. The paid sick leave entitlement was only available to employees who were unable to work or telework, thus the EPSLA only permits paid sick leave to be taken when telework is not possible. See id. at §§ 5102; 5110(2).

However, under the EPSLA, there exists an exemption for health care providers, such that employers may deny leave to employees with qualifying conditions if the employee "is a health care provider or an emergency responder." Id. § 5102(a). The FFCRA defines a health care provider within the EFMLEA, which as an amendment to the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 et seq., directly defines a health care provider under the same terms as the FMLA. See

22

FFCRA §§ 3105; 5110(4).  The FMLA defines a "health care provider" as a "doctor of medicine or osteopathy who is authorized to practice medicine or surgery (as appropriate)," or "any other person determined by the Secretary to be capable of providing health care services."  29 U.S.C. § 2611(6)(B).

Another key feature of the FFCRA is that it lacks its own, independent enforcement mechanism, and instead the Act adopts provisions of the FLSA.  Specifically, section 5105 "Enforcement" states:

> (a) UNPAID SICK LEAVE. – An employer who violates section 5102 [of the EPSLA entitled "PAID SICK TIME REQUIREMENT"] shall—
>
>> (1) be considered to have failed to pay minimum wages in violation of section 6 of the [FLSA] (29 U.S.C. 206); and
>>
>> (2) be subject to the penalties described in sections 16 and 17 of such Act (29 U.S.C. 216; 217) with respect to such violation.
>
> (b) UNLAWFUL TERMINATION. – An employer who willfully violates section 5104 [of the EPSLA entitled "PROHIBITED ACTS"] shall—
>
>> (1) be considered to be in violation of section 15(a)(3) of the [FLSA] (29 U.S.C. 215(a)(3); and
>>
>> (2) be subject to the penalties described in sections 16 and 17 of such Act (29 U.S.C. 216; 217) with respect to such violation.

FFCRA § 5105.

Applying the FFCRA's basic tenants against the instant record, it is clear why Rossano and Mackiewicz initially

23

concluded PATHS was not exempt from the Act's paid leave
requirements for employees.  As a billing company for hospitals,
none of PATHS employees were health care providers as defined by
the FMLA or an emergency responder.  And there is nothing
contained within PATHS' initial plan to offer remote work that
otherwise contravenes the FFCRA's requirements provided they
allowed employees to take their entitled paid sick leave.
Ultimately, as the EPSLA took effect on April 2, 2020, Defendant
would have been obligated to provide paid sick leave to
Plaintiff as of that date since, on March 31, 2020, Plaintiff
had "been advised by a health care provider to self-quarantine
due to concerns related to COVID-19" and he was "experiencing
symptoms of COVID-19 and seeking a medical diagnosis."  But of
course, the record is not this simple.

The FFCRA also includes a provision that allows the
Secretary of Labor to issue regulations "to exclude certain
health care providers and emergency responders from the
definition of employee under section 5110(1) including by
allowing the employer of such health care providers and
emergency responders to opt out."  FFCRA § 5111.  It was
pursuant to this portion of the FFCRA that, on April 1, 2020, a
day before the EPSLA was to take effect, the DOL promulgated a
rule (the "April Rule") implementing the FFCRA through its Wage
and Hour Division ("WHD"), see 85 Fed. Reg. 19326 (Apr. 6,

2020), which, among other things, greatly expanded the scope of coverage for the definition of "health care providers" under the FFCRA.  The DOL's April Rule regulations became operational on April 1, 2020, effective on April 2, 2020, and provided in pertinent part:

> (i) For the purposes of this definition Employees who may be exempted from Paid Sick Leave or Expanded Family and Medical Leave by their Employer under the FFCRA, a health care provider is anyone employed at any doctor's office, hospital, health care center, clinic, post-secondary educational institution offering health care instruction, medical school, local health department or agency, nursing facility, retirement facility, nursing home, home health care provider, any facility that performs laboratory or medical testing, pharmacy, or any similar institution, Employer, or entity.  This includes any permanent or temporary institution, facility, location, or site where medical services are provided that are similar to such institutions.

> (ii) This definition includes any individual employed by an entity that contracts with any of these institutions described above to provide services or to maintain the operation of the facility where that individual's services support the operation of the facility where that individual's services support the operation of the facility.  This also includes anyone employed by any entity that provides medical services, produces medical products, or is otherwise involved in the making of COVID-19 related medical equipment, tests, drugs, vaccines, diagnostic vehicles, or treatments.  This also includes any individual that the highest official of a State or territory, including the District

> of Columbia, determines is a health care
> provider necessary for that State's
> or territory's or the District of Columbia's
> response to COVID-19.

85 Fed. Reg. 19326 at § 826.30(c).  Also illustrative of the

DOL's April Rule regulation's expanded definition was the WHD's

publication of guidance regarding "frequently asked questions"

on the FFCRA's website, which stated:

> 56. Who is a "health care provider" who may
> be excluded by their employer from paid sick
> leave and/or expanded family and medical
> leave?
>
> For the purposes of employees who may be
> exempted from paid sick leave or expanded
> family and medical leave by their employer
> under the FFCRA, a health care provider is
> anyone employed at any doctor's office,
> hospital, health care center, clinic, post-
> secondary educational institution offering
> health care instruction, medical school,
> local health department or agency, nursing
> facility, retirement facility, nursing home,
> home health care provider, any facility that
> performs laboratory or medical testing,
> pharmacy, or any similar institution,
> employer, or entity. This includes any
> permanent or temporary institution,
> facility, location, or site where medical
> services are provided that are similar to
> such institutions.
>
> This definition includes any individual
> employed by an entity that contracts with
> any of the above institutions, employers, or
> entities institutions to provide services or
> to maintain the operation of the facility.
> This also includes anyone employed by any
> entity that provides medical services,
> produces medical products, or is otherwise
> involved in the making of COVID-19 related
> medical equipment, tests, drugs, vaccines,

diagnostic vehicles, or treatments . . . .
Defendant's Brief in support of the Motion for Summary
Judgment [Dkt. No. 19-2], at 6-7 (quoting
https://web.archive.org/web/20200330142446/https://www
.dol.gov/agencies/whd/pandemic/ffcra
-questions (version of the guidance posted on the Wage
and Hour Division Website on March 30, 2020).

Thus, the record establishes that Defendant learned of the
April Rule definition on April 2, 2020, and Rossano and
Mackiewicz correctly concluded, based on the new DOL regulations
and guidance, that PATHS was exempt from the FFCRA's paid sick
leave requirements.  PATHS accordingly updated its management
and its application of the FFCRA for paid sick leave.

Therefore, when Rossano and Plaintiff spoke on April 3,
2020, Rossano was not intentionally violating the FFCRA when she
advised Plaintiff that his options were to either use his paid
time off/sick leave that he had accumulated or to take a
voluntary layoff and apply for unemployment benefits.  As he did
not advise Rossano which path he preferred, and instead asked
whether he could be allowed to work from home, the record is
clear that Rossano was emphatic that Plaintiff was expected to
return to work on Thursday, April 23, 2020 or take a voluntarily
layoff due to his COVID-19 concerns.  Had this simply been the
case, resolution would be complete, but this is not where the

27

Court's analysis ends.

While Defendant's letter to Plaintiff and Rossano's text message to Plaintiff makes clear that he was laid off on April 24, 2020, on August 3, 2020, the United States District Court for the Southern District of New York issued a ruling vacating provisions of the DOL's April Rule, which included the expanded definition of "health care providers." See New York, 477 F. Supp. 3d at 1-19.  Specifically, the court found the DOL exceeded its authority by issuing a "vastly overbroad" definition of health care provider that was inconsistent with the FFCRA's "unambiguous terms." Id. at 14-15.  The court found that the FFCRA "requires that the Secretary determine that the *employee* be capable of furnishing healthcare services." Id. at 14 (emphasis in the original).  "The DOL's definition, however, hinges entirely on the identity of the *employer*, in that it applies to anyone employed at or by certain classes of employers, rather than the skills, role, duties, or capabilities of a class of employees." Id. at 14-15 (emphasis in the original).

As a result of the ruling, the DOL issued a revised rule (the "September Rule") that took effect on September 16, 2020 and narrowed the definition, stating that "a health care provider is:"

> (A) Any Employee who is a health care

28

provider under 29 C.F.R. 825.102 and
825.125, or;

(B) Any other Employee who is capable of
providing health care services, meaning he
or she is employed to provide diagnostic
services, preventative services, treatment
services, or other services that integrated
with and necessary to the provision of
patient care and, if not provided, would
adversely impact patient care.

29 C.F.R. § 826.30.

It was from this revised September Rule's regulations and
guidance that PATHS determined the FFCRA exemption no longer
applied to PATHS' employees.  Rossano declares that PATHS was
unaware of the district court's August ruling invalidating the
April Rule's regulations and guidance, but, as soon as she
learned of the September Rule, she and Mackiewicz changed PATHS'
policy of paid sick leave to comport with DOL's September Rule's
regulations and guidance concerning the FFCRA.  As evidence of
this, Defendant notes Rossano circulated an email among PATHS'
employees on October 6, 2020, to advise that the DOL had changed
its regulations and guidance regarding paid sick leave under the
FFCRA and provided a hyperlink to the guidance PATHS relied on
in reaching this determination.  Rossano declares that once
PATHS learned of and adopted the new DOL position, PATHS
received and granted paid sick leave under the FFCRA's EPSLA and
EFMLEA to thirty employees, who included several billing
representatives and one billing representative from the Medicare

Department.  Accordingly, PATHS argues it relied on the FFCRA and the DOL's regulations and guidance at all relevant times and concurrently updated PATHS' application of the regulations as the regulations were updated and augmented over time.

Thus, the first question presented by both parties' motions is whether Defendant violated the FFCRA by denying Plaintiff paid sick leave under the EPSLA and terminating/instructing Plaintiff to take a voluntary layoff because he did not return to work after taking sick leave.  Because the FFCRA affords an exemption to mandatory paid sick leave to health care providers, the question becomes, which definition of health care provider does the court apply to Plaintiff given the definition's evolution over time.  Fortunately, this is not a novel issue. As courts in this district and circuit have made clear, this Court applies the FFCRA's definition and not DOL's definitions as set forth in the April Rule and the revised September Rule. See, e.g., Beltran v. 2 Deer Park Drive Operations, LLC, No. 20-8454 (MAS/LHG), 2021 WL 794745, at *7 (D.N.J. Feb. 28, 2021) (holding that the September revised rule does not apply retroactively and because the April rule was found to be unlawful, this restored the "status quo before the invalid rule took effect," thus prior to the September revised rule, the operative definition of a "health care provider" is the definition provided by the FFCRA); Payne v. Woods Servs., Inc.,

No. 20-4651 (MMB), 2021 WL 603725, at *5 (E.D. Pa. Feb. 16, 2021) ("That the [April] Rule was in place at the time of Plaintiff's firing is irrelevant when the Rule itself was not lawfully promulgated" and "because the [September Revised] Rule was not yet in effect at the time of Plaintiff's firing, and it does not have retroactive application, the definition in the FFCRA itself is the one that the [c]ourt should apply."). Thus, despite the April Rule being in effect at all relevant times to this action, because that rule was invalidated, we must apply the FFCRA's initial definition, i.e. the definition from the FMLA.

The Court finds that in applying the FFCRA's health care provider exemption against the instant record demonstrates that Defendant violated the FFCRA when it failed to provide Plaintiff paid sick leave and terminated him / told him to return to work or take a voluntary layoff. Ultimately, Defendant concedes, as Rossano and Mackiewicz originally concluded before the April Rule, PATHS' was not exempt from the FFCRA's paid sick leave exemption based on the FMLA's original definition of "health care provider" under the FMLA, thus Defendant violated the FFCRA. And yet, this case turns in the opposite direction. Simply put, PATHS cannot not be held liable as it presents a valid defense because "Congress immunized precisely the kind of reliance that Defendant demonstrated here." Connor v. Prof'l

Med. Billing, Inc., No. 20-183 (HAB), 2022 WL 2171214, at *4
(N.D. Ind. June 16, 2022).

Defendant argues it cannot be held liable because PATHS
relied in good faith on the DOL's regulations and guidance
regarding the April Rule's health care provider exemption to the
FFCRA's entitlement to paid sick leave and accordingly based
PATHS' employment decisions on same.  Defendant argues it should
not be punished for relying on the DOL's regulations and
guidance in making its employment-related decisions concerning
what was a new law enacted at the height of the COVID-19
pandemic.  Defendant avers this is precisely why Section 259 of
the Portal-to-Portal Act of 1947, 29 U.S.C. § 259 exists – to
provide an absolute defense for employers who rely on DOL
regulations and guidance to make decisions, even if those
regulations and guidance are later invalidated.  Thus, Defendant
concludes it should be insulated from liability from Plaintiff's
FFRCA claims.  The Court agrees.

In sum, the Court is called to answer whether the FLSA's
affirmative defense of good faith reliance applies to the FFCRA.
For the foregoing reason, the Court finds the defense applies
and specifically protects PATHS from liability.  As discussed
above, the FFCRA is only enforceable through the FLSA, such that
any violations of the Act results in a determination that: (1)
the employer "failed to pay minimum wages in violation of

32

section 6 of the [FLSA] (29 U.S.C. 206);" and is "subject to the penalties described in sections 16 and 17 of [the FLSA] (29 U.S.C. 216; 217) with respect to such violation;" and/or (2) the employer "shall be considered to be in violation of 15(a)(3) of the [FLSA] (29 U.S.C. 215(a)(3);" and shall "be subject to the penalties described in sections 16 and 17 of [the FLSA] (29 U.S.C. 216; 217) with respect to such violation." FFCRA § 5105. However, because there exits the FLSA's affirmative defense of good faith reliance to these FLSA provisions, this defense is also applicable to the FFCRA. Connor, 2022 WL 2171214, at \*\*4-6.

As part of the Portal-to-Portal Act of 1947, 29 U.S.C. § 251 *et seq.*, Congress enacted Section 259 ("Section 259"), 29 U.S.C. § 259, thus "making it clear that it did not intend for the Fair Labor Standards Act to subject employers to penalties for such good faith reliance [] on administrative regulations, particularly where the regulations have been interpreted by a compliance officer of the Wage and Hour Division of the Department of Labor[.]" Cole v. Farm Fresh Poultry, Inc., 824 F.2d 923, 925-26 (11th Cir. 1987) (citation omitted). Section 259 provides, in relevant part, that:

> [N]o employer shall be subject to any
> liability or punishment for or on account of
> the failure of the employer to pay minimum
> wages or overtime compensation under the
> Fair Labor Standards Act of 1938, as

33

amended, the Walsh-Healey Act, or the Bacon-Davis Act, if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of the agency of the United States specified in subsection (b) of this section, or any administrative practice or enforcement policy of such agency with respect to the class of employers to which he belonged. Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect.

(b) The agency referred to in subsection (a) shall be—

(1) in the case of the Fair Labor Standards Act of 1938, as amended--the Administrator of the Wage and Hour Division of the Department of Labor;

(2) in the case of the Walsh-Healey Act--the Secretary of Labor, or any Federal officer utilized by him in the administration of such Act[.]

29 U.S.C. § 259.  In short, "[t]he language and legislative history of [the Portal-to-Portal Act] indicate that courts should be hesitant to impose retroactive ... liability on employers in the face of an administrative interpretation which the employer could plausibly interpret as insulating him from liability." Marshall v. Baptist Hosp., Inc., 668 F.2d 234, 238 (6th Cir. 1981).

To establish a Section 259 defense, the employer must demonstrate "it acted: (1) in good faith, (2) in conformity with, and (3) in reliance on the specified agency's writing, practice, or policy." In re Cargill Meat Solutions Wage and Hour Litig., 632 F. Supp. 2d 368, 289-90 (M.D. Pa. 2008) (citing Alvarez v. IBP, Inc., 339 F.3d 894, 907 (9th Cir. 2003) (quoting Frank v. McQuigg, 950 F.2d 590, 598 (9th Cir. 1991)), aff'd, 546 U.S. 21 (2005)); Johnson v. Nat'l Collegiate Athletic Ass'n, 556 F. Supp. 3d 491, 502-503 (E.D. Pa. 2021) (citing same); Henchy v. City of Absecon, 148 F. Supp. 435 (D.N.J. 2011) (holding the employer must prove "(1) good faith reliance and (2) conformity with the writing relied upon.") (citation omitted); EEOC v. Home Ins. Co., 672 F.2d 252, 263 (2d Cir. 1982) (holding "the Portal Act defense requires the employer to establish three interrelated elements: (1) that its action was taken in reliance on a ruling of the Administrator, (2) that it was in conformity with that ruling, and (3) that it was in good faith."). Ultimately, "[t]he employer bears the burden of proof to establish a [Section] 259 exception." In re Cargill Meat Solutions Wage and Hour Litig., 632 F. Supp. 2d at 389 (citing Alvarez, 339 F.3d at 907).

Here, the record unambiguously supports each of the three elements, resulting in Defendant meeting its burden. Following the passage of the FFCRA on March 26, 2020, Defendant was

35

preparing to allow its employees to take FFCRA leave under the EPSLA and the EFMLEA.  This is well-documented in the record.  For example, Rossano's statements demonstrate (1) she learned the FFCRA existed and had been signed into law in mid-March (though importantly, the EPSLA would not take effect until April 2, 2020), (2) she discussed the FFCRA with PATHS' CEO and the two concluded that PATHS' employees were not exempted from the FFCRA, (3) PATHS' Human Resources Department circulated an email to all employees on March 19, 2020, explaining a plan to move forward in the pandemic – nothing contained within the plan undermined or contracted the FFCRA, as PATHS understood it had to comport with the Act, and (4) on March 26, 2020 she circulated an email to PATHS' employees that included a circular from the Department of Labor ("DOL") entitled Employee Rights Paid Sick Leave and Expanded Family and Medical Leave Under the Families First Coronavirus Response Act.

Defendant only changed course on April 2, 2020, when PATHS learned the DOL had issued the April Rule.  In good faith,[6]

---

[6] "An employer establishes that it acted in good faith when it shows that it 'acted as a reasonably prudent [person] would have acted under the circumstances, [that] it have honesty of intention and no knowledge of circumstances which ought to put him upon inquiry.  Quinn v. N.Y. State Elec. & Gas Corp., 621 F. Supp. 1086, 1091 (N.D.N.Y. 1985) (quoting 29 C.F.R. 790.15(a).  While "the 'question of good faith is fact intensive and implicates a question of credibility for the trier of fact,'" Henchy, 148 F. Supp. 2d at 442 (quoting Bayles v. Am. Med. Response of Colorado, 937 F. Supp. 1477, 1489 (D. Colo. 1996),

Defendant relied on and acted in conformity with the DOL's April Rule,[7] which resulted in regulations and guidance that expanded the health care provider definition and thus expanded employers' exemption to the FFCRA's paid sick leave entitlement.[8]  This is also well-supported in the record as: (1) Rossano reviewed the DOL's website to review the newly enacted regulations and guidance (specifically, she reviewed the "Frequently Asked Questions" section of the DOL's FFCRA website), (2) she conferred with the CEO and the two concluded that the April Rule meant that PATHS' employees were now exempt from the FFCRA's paid leave entitlements because PATHS met the expanded definition of a health care provider by virtue of its contracts with for hospitals, (3) she emailed the CEO further information

---

the Court is satisfied this record does not demonstrate ambiguity in Defendant's acts to question whether it acted in good faith.

[7] As discussed above, as a medical billing company that contracts with hospitals, PATHS obviously met the plain language of the exemption established by the April Rule.

[8] As Defendant correctly notes, an employer may establish a Section 259 defense based on, among other forms of guidance from the DOL, a "regulation," "interpretation," "administrative practice," or "enforcement policy."  29 U.S.C. § 259(a). Without defining each term it is clear that the April Rule is a regulation under Section 259.  Moreover, any policies, bulletins, releases, interpretations, and other statements issued by the DOL in conformance and/or explaining the April Rule would also likely satisfy a Section 259 defense – but as the Court is presented with a true DOL regulation, the Court need not consider this issue any further.

on the new health care provider definition from the DOL's website, to which Mackiewicz directed her to inform PATHS' management that the company's employees were in fact not exempt from the FFCRA pursuant to the April Rule, and (4) on April 3, 2020, Rossano emailed the heads of PATHS' departments to advise that the DOL's new guidance provides that "PATHS employees are exempt from entitlement to the FFCRA," thus PATHS was revising its paid sick leave policy.

Accordingly, Rossano did not need to offer Plaintiff paid sick leave prior to April 2, 2020, since that is the day the EPSLA became effective.  As the DOL enacted the April Rule on April 2, 2020, and assuming the April Rule was never invalidated, Plaintiff would not have been entitled to paid sick leave under the FFCRA.  Thus, believing PATHS was exempt from the FFCRA, based on the April Rule, Rossano did not offer Plaintiff paid sick leave under the FFCRA and instead explained that his only options were to use his accrued paid time and paid sick leave or to apply for unemployment benefits and take a voluntary layoff.[9]  As Plaintiff did not return to work on the

---

[9] The Court recognizes that Plaintiff asserts that he was not told he could take regular accrued sick time or other allowed leave in lieu of the FFCRA leave he had sought.  But this dispute is not a material one.  First, it is notable that Plaintiff does not allege that such time was not available to him or why both sides would not be under the unspoken assumption that the FFCRA left such benefits intact.  Second, it is undisputed that Plaintiff never requested to use those benefits.

April 23, 2020 deadline, Rossano explained that he was voluntarily laid off per their prior discussions.

Moreover, PATHS' actions subsequent to the April Rule, when it learned of the September Rule and the fact that the April Rule was invalidated, further support that PATHS relied on and acted in conformity with the DOL's regulations and guidance. Although PATHS claims it was unaware that a court had invalidated the April Rule that subsequent August, PATHS learned in September 2020 that the DOL was planning to issue new regulations and guidance regarding the FFCRA, which Rossano learned of sometime between September 11, 2020 and October 6, 2020. Rossano and Mackiewicz conferred over the September Rule, determining that PATHS' employees were no longer covered by the health care provider exemption to the FFCRA. Thus, on October 6, 2020, Rossano circulated an email to all PATHS employees to advise of the revised DOL regulations and guidance, and also provided a hyperlink to the guidance. Once the September Rule was in effect and PATHS learned of it, the company complied with its obligations, providing thirty employees paid sick leave

---

Third, it appears uncontested that Plaintiff was paid for any unused paid time and sick leave time when he as terminated and therefore was not denied such benefits. In sum, Plaintiff's sole claim in this case relies upon an entitlement to the extra time provided by the FFCRA, a claim for which PATHS has a complete statutory defense.

under the FFCRA.  Among these thirty employees were billing representatives, just like Plaintiff, and, in fact, one employee who was provided FFCRA paid sick leave was a billing representative from the same department as Plaintiff.

Thus, the record establishes that PATHS relied on the DOL's regulations and guidance, as PATHS adjusted its paid sick leave and employee treatment in accordance with the original FFCRA's definition of health care providers, the April Rule, and the September Rule.  PATHS, having established conclusively that it acted at all times in good faith, relied on and acted in conformity with the April Rule, has met all the elements of a Section 259 defense to Plaintiff's claims.

Although Plaintiff argues the FFCRA does not mention Section 259, making the defense not expressly included in the Act and thus deliberately omitted, the Court is not persuaded by Plaintiff's position.[10]  And despite Plaintiff's claim there is

---

[10] While this Court is aware of the Payne and Beltran cases, see supra, Plaintiff's citations are not applicable to a Section 259 defense as that defense was not an issue in those cases. Likewise, the Court is unpersuaded by Plaintiff's citation to Figas v. Horsehead Corp., No. 06-1344, 2008 WL 4170043 (W.D. Pa. Sept. 3, 2008) as that case is distinguishable by the fact that the employer could not establish it acted in good faith and in conformity with two DOL opinion letters because the employer's practice that was allegedly instituted in reliance of the DOL's opinions actually predated the opinion letters.  Id. at *21.  As this is not the case at bar, Figas actually supports Defendant's position.

no caselaw supporting Defendant's application of Section 259 to the FFCRA, the United States District Court for the Northern District of Indiana did exactly that in an action for violations of the FFCRA, holding:

> The Court sympathizes with both parties.
> Defendant appropriately relied on the only
> rule available to it when it decided
> Plaintiff's eligibility for paid leave under
> the FFCRA.  Plaintiff, also appropriately,
> believes that she was always eligible for
> leave under the properly enacted standard.
> But Congress has decided that this tie must
> go to Defendant, and the Court is in no
> position to disagree.  Defendant cannot be
> held liable for interfering with Plaintiff's
> rights under the FFCRA, and summary judgment
> will be entered on that claim.

Connor, 2022 WL 2171214, at *6.  This Court finds the same.

The Court also concludes that Plaintiff's claim of retaliation must fail.  The FFRCA clearly protects against retaliation.  Specifically, Section 5104 makes it "unlawful for any employer to discharge, discipline, or in any other manner discriminate against any employee who—(1) takes leave in accordance with [FFCRA]; and (2) has filed any complaint or instituted or caused to be instituted any proceeding under or related to [FFCRA]"  FFRCA § 5104.  Again, as described in greater detail above, the FFCRA relies on the FLSA to enforce claims of retaliation, and in case of a termination an employer who willfully violates Section 5104 is "considered to be in

41

violation of 15(a)(3) of the [FLSA] (29 U.S.C. 215(a)(3))"[11] and "be subject to the penalties described in sections 16 and 17 of [the FLSA] (29 U.S.C. 216; 217) with respect to such violation." Id. at §5105.  Thus, as the parties both agree, the Court's analysis of this issue turns on whether Plaintiff presents a retaliation claim under the framework of the FLSA.

To establish a prima facie claim for retaliation under the FLSA, and, thus, in turn, the FFCRA and the EPSLA, it is the plaintiff's initial burden to demonstrate that: (1) the plaintiff engaged in a protected activity, (2) the employer undertook an adverse employment action against the plaintiff, and (3) there was a causal link between the plaintiff's protected action and the employer's adverse action.  See 29 U.S.C. § 215; see also Berrada v. Cohen, 752 F. App'x 158, 164 (3d Cir. 2019) (citing Darveau v. Detecon, 515 F.3d 334, 340 (4th Cir. 2008)); see also Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007); see also Harris v. Clean Harbors Env't Servs., Inc., No. 18-cv-1046 (NLH/JS), 2019 WL 5446299, at **12-

---

[11] In fact Section 5104's language in many ways borrows from Section 215 of the FLSA, which prohibits against employers "discharge[ing] or in any other manner discriminat[ing] against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter ...."  29 U.S.C. § 215(a)(3).  It is thus only logical that an understanding of what constitutes a claim of retaliation under the FLSA is similar and essential to assess whether a claim of retaliation is presented under the FFCRA.

15 (D.N.J. Oct. 24, 2019) (applying the McDonnell Douglas[12]

burden shifting framework to FLSA retaliation claims).

To meet the standard, the plaintiff must produce sufficient

evidence to allow the factfinder to infer the fact at issue.

Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 n.7

(1981).  After a prima facie case is presented, the burden

shifts to the employer to articulate a legitimate, non-

retaliatory reason for the adverse action.  Marra, 497 F.3d at

300.  If the employer is successful, the burden of production

returns to the plaintiff, who must show by a preponderance of

the evidence that the employer's reason was false, and that the

true source for the adverse employment action was retaliation.

Id. (citing Moore v. City of Phila., 461 F.3d 331, 342 (3d Cir.

2006)).

In the case at hand, the parties contest whether the record

presents any of the three elements needed to present a prima

facie case.  Defendant first argues that Plaintiff did not

engage in a protected activity, claiming there is no record

evidence that he requested any form of FFCRA leave, and, even if

he did, a request for FFCRA leave is not a protected activity.

In addition, Defendant points out that Plaintiff never filed any

complaints or initiated any proceedings during the relevant time

---

[12] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

period.  Defendant also claims its refusal to allow Plaintiff to work remotely is not an adverse employment action, and, for a variety of reasons, PATHS' alleged termination and refusal to rehire Plaintiff are not causally linked to any protected activity.

Plaintiff counters, claiming he requested FFCRA paid sick leave during the April 3, 2020 telephone conversation with Rossano, thus satisfying the first element of engaging in a protected activity.  Plaintiff further argues the record shows at least three acts of retaliation causally linked to his FFCRA request, namely PATHS' decisions refusing to allow him to work remotely, terminating him while he was still on sick leave, and refusing to rehire him.

The Court resolves any retaliation claim in Defendant's favor as Plaintiff cannot show a causal link between the alleged retaliation and the protected activity.  To establish a causal link or causation in a FLSA retaliation claim, the Third Circuit allows plaintiffs to present a "broad array of evidence." Farrell v. Planters Lifesavers Co., 206 F.3d 271, 284 (3d Cir. 2000).  District courts in turn have "focused on two main factors in finding the causal link necessary for retaliation: timing and evidence of ongoing antagonism." McGlone v. Phila. Gas Works, 733 F. App'x 606, 612, (3d Cir. 2018) (quoting Abramson v. William Patterson College of N.J., 260 F.3d 265, 288

(3d Cir. 2001)).

"An employee may establish a causal nexus if he shows 'unusually suggestive' temporal proximity between" the protected activity and the adverse action.  Holt v. Pennsylvania, 683 F. App'x 151, 157 (3d Cir. 2017) (quoting LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007)).  For instance, where a plaintiff is fired just two days after filing an EEOC complaint, causation may be plainly established.  See Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989).

However, time is not always the determinative issue, as courts will also consider other evidence to assess whether a causal link is established.  See Holt, 683 F. App'x at 157 (quoting Farrell, 206 F.3d at 281) (when too much time has passed to allow the finding of a causal link between the protected activity and the adverse action, "courts may look to the intervening period for other evidence of retaliatory animus").  Such evidence can include "a pattern of ongoing antagonism, inconsistencies in the employer's justifications, or any other 'evidence gleaned from the record as a whole' that is sufficient to support an inference of retaliatory animus."  Id. (quoting Farrell, 206 F.3d at 281).  In addition, certain other considerations about causation must also be taken into account. For example, an employer must be aware of a plaintiff's engagement in a protected activity for a retaliation claim to be

cognizable, as the Third Circuit holds, "[i]t is not reasonable for a factfinder to infer that an employer's reaction was motivated by an intent to retaliate for conduct of which the employer's decision maker was not aware." Moore v. City of Phila., 461 F.3d 331, 351 (3d Cir. 2006).

Here, the record does not demonstrate any evidence of a retaliatory animus. In fact, as set forth in more detail above the record is to the contrary. PATHS very clearly understood initially that the FFCRA mandated that certain employees be given paid sick leave and intended to follow the law, as is evidenced by PATHS' plan addressing the COVID-19 pandemic to allow certain employees to work remotely, Rossano and Mackiewicz's determination that the FFCRA applied to PATHS, and Rossano's email to employees with the DOL's circular regarding employees' rights to paid sick leave and expanded family and medical leave under the FFCRA. PATHS fully complied, in good faith, with the FFCRA when it was first enacted.

Under the original version of the FFCRA, although it was never PATHS' goal to allow every employee to work remotely, PATHS decided employees who met CDC requirements would be prioritized for remote work, such as those with preexisting conditions. There is nothing in the record demonstrating that PATHS knew of any reason that Plaintiff should be prioritized. In fact, Plaintiff, who had only been on the job for about six

months, was one of four billing representatives from his
department who PATHS determined could not work remotely because
they needed supervision based on their lack of experience, a
need for further training, and other issues.  In support of this
point, PATHS notes no Medicare department employee with less
than two years of experience was allowed to work remotely.

     At the time Plaintiff first inquired about PATHS' leave
policy in relation to COVID-19 concerns, his inquiries did not
ask for paid sick leave, rather he merely asked what the policy
is "right now."  The subsequent events demonstrate that Rossano
expressed concern for Plaintiff, telling him he should seek
medical care and guidance if he believed he was ill.  Rossano
went so far as to give Plaintiff her personal cellphone number
to allow him to stay in contact if he had further concerns or
questions.  At the time Rossano and Plaintiff first spoke, he
was clearly entitled to take paid sick leave and there is
nothing in the record to demonstrate that PATHS would have
refused him or in any way took an adverse employment action
against him.

     When the DOL issued the April Rule, PATHS' position on paid
sick leave changed in reliance on the new regulations and
guidance.  When Plaintiff and Rossano next spoke, it was after
the April Rule, and thus PATHS believed it was exempted from
providing Plaintiff with FFCRA paid sick leave.  PATHS allowed

Plaintiff unpaid sick leave and there were frequent messages exchanged between Rossano and Plaintiff in which she inquired as to his health and asked when he would be returning to work.  In sum, PATHS afforded Plaintiff twenty-one days of unpaid sick leave before he took a voluntarily lay off and was eventually terminated, during which time PATHS actively requested that he return to work.  PATHS made clear that Plaintiff needed to return to work by Thursday, April 23, 2020, or else he had to take a voluntary lay off.  A fact that Plaintiff agreed to.

When Plaintiff provided Rossano with a doctor's note asking to allow him to work from home until June 1, 2020, PATHS responded in the same consistent manner that Rossano had already explained to Plaintiff, namely that he was not eligible to work remotely and was expected to return to work or else.  As Plaintiff did not return to work, Rossano informed him that he was laid off and that he needed to "reach back out to management for reemployment opportunities once you are cleared to work in an office environment."  When seeking to be rehired, Plaintiff did not reach back out to his supervisors as instructed, rather, he reached out to Rossano.  And had Plaintiff sought to be rehired, Martz says he would not have been rehired for his prior position because there was not enough work in that department.

Moreover, sometime in October, after learning of the September Rule and determining that PATHS' employees were no

longer exempt, PATHS fully adopted the new rule and Rossano emailed all employees to advise them of the new DOL guidance affording paid sick leave.  PATHS received and granted requests for FFCRA paid sick leave, including for billing representatives and even a billing representative from Plaintiff's former Medicare department.  And every employee who took paid sick leave eventually returned to work at PATHS following their leave without incident.

Thus, the record fails to demonstrate any evidence of retaliatory animus.  See Farrell, 206 F.3d at 281.  Defendant's pattern of adopting a paid sick leave policy was in accordance with the evolving regulations and guidance from the DOL.  See Holt, 683 F. App'x at 157.  There are no inconsistencies with PATHS' justification for denying Plaintiff's requests to work remotely,[13] as PATHS determined Plaintiff and several other employees were ineligible.  And, if anything, the record is abundantly clear that Plaintiff was offered significant time to seek medical care and quarantine (albeit unpaid) and repeated opportunities to return to work.  Id.

Although the April Rule was eventually invalidated and

---

[13] Even if Plaintiff could make out a prima facia case, Defendant has articulated a non-discriminatory reason for Plaintiff's termination and Plaintiff has failed to show that the proffered reasons were merely pretextual.

replaced by the September Rule, it would not be reasonable under this record for a factfinder to conclude that PATHS' actions were motivated by an intent to retaliate against Plaintiff for seeking FFCRA paid sick leave when PATHS was not aware it had an obligation to provide Plaintiff this relief.  PATHS' actions fully conformed to the operative rules and regulations at the time.

Upon this record, Plaintiff cannot prove causation.  PATHS did not terminate or refuse to rehire Plaintiff for attempting to exercise his FFCRA rights.  Rather, at worst, PATHS terminated Plaintiff for asserting rights PATHS, in good faith, did not believe he was entitled to.  Simply put, Plaintiff was not "retaliated" against either legally or in the ordinary sense of the word.  To allow a retaliation claim on these facts would simply conflate such a claim with the elements of the underlying statutory tort.

Furthermore, a viable retaliation claim on these facts would in essence eviscerate the Section 259 defense. Retaliatory animus and good faith are polar opposites.  Just as it would be error to find a causal link when (1) the employer acted in good faith, and (2) the employer was unaware and had no reason to believe that Plaintiff's conduct, even assuming he asked for FFCRA paid sick leave, was a protected activity, see Moore, 461 F.3d at 351, this same good faith undergirds the

Section 259 defense.  If a good faith defense precludes a claim based on the underlying substantive provision, it should also be a complete defense to a claim of retaliation for asserting the same underlying right.

Accordingly, because Defendant has established its affirmative defense for the FLSA enforcement scheme employed by the FFCRA, summary judgment is granted to Defendant.

**CONCLUSION**

Based on the foregoing analysis, Defendant's Motion for Summary Judgment will be granted.  An appropriate Order will be entered.


Date:  July 19, 2022                    s/ Noel L. Hillman
At Camden, New Jersey            NOEL L. HILLMAN, U.S.D.J.